*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A15-0128**

State of Minnesota,
Respondent,

vs.

Dashaunta Dmar Gomez,
Appellant.

**Filed February 1, 2016**
**Affirmed**
**Reyes, Judge**

Hennepin County District Court
File No. 27CR145025

Michael O. Freeman, Hennepin County Attorney, Linda K. Jenny, Assistant County Attorney, Minneapolis, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Leslie J. Rosenberg, Assistant State Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Halbrooks, Presiding Judge; Stauber, Judge; and Reyes, Judge.

**U N P U B L I S H E D   O P I N I O N**

**REYES**, Judge

On appeal from his convictions of second-degree intentional murder and possession of a firearm by an ineligible person, appellant argues that (1) the evidence failed to prove that he intended to cause the death of another; (2) he is entitled to a new trial because the

district court abused its discretion in admitting texts between appellant and his girlfriend; and (3) the prosecutor committed reversible misconduct. We affirm.

## FACTS

Around 11:00 p.m. on February 19, 2014, Demetrias Cooper went to the bar with Q.F. and J.H., the victim in this case. Demetrias is the stepfather of appellant Dashaunta Dmar Gomez. Both Demetrias and J.H. had been drinking that evening at the Hillside house in Minneapolis before they arrived at the bar. J.H. was thrown out of the bar for smoking marijuana and then walked down the street. Demetrias argued with Q.F. about having to pick up J.H. down the street, which escalated into a physical alteration. Q.F. punched Demetrias. In response, Demetrias attacked Q.F. with a knife and his car. Eventually, Demetrias, Q.F., and J.H. all returned to the Hillside house. Demetrias had one last physical altercation with both Q.F. and J.H. before driving away in his car.

Appellant testified at trial to the following. Shortly after 2:00 a.m. that same night, Demetrias drove to his house and asked appellant to get in the car. Demetrias gave appellant a gun and told him "to hold it." Appellant who is left handed, put the gun in his left-hand coat pocket. Demetrias then drove back to the Hillside house. Demetrias entered the house and appellant followed him approximately ten feet behind. When appellant was a few feet inside the door, J.H. approached him. J.H., who was unarmed, grabbed at appellant's waist. Appellant pointed the gun at J.H., pulled the trigger two times, and shot J.H. twice in the chest. After shooting J.H., he pointed the gun at the other people in the room and told them not to move. He ran out the front door and drove away with Demetrias.

2

Appellant gave Demetrias the gun back. Two witnesses, A.B. and C.W. testified at trial that appellant shot J.H.

Demetrias was arrested later that same day and charged with first-degree and second-degree murder. When appellant learned that J.H. died, he went into hiding for nearly two weeks before he was arrested. During this time, appellant and his girlfriend exchanged text messages on their cell phones, including that he "did the sh-t," he needed money, and that he would not turn himself in.

Appellant was charged with first-degree murder pursuant to Minn. Stat. § 609.185, (a)(1) (2012); second-degree murder pursuant to Minn. Stat. § 609.19, subd. 1(1) (2012); and being a felon in possession of a firearm pursuant to Minn. Stat. § 624.713 (2012). The jury acquitted appellant of first-degree murder but found him guilty of the remaining two charges. The district court sentenced appellant to 60 months in prison for being a prohibited person in possession of a firearm and to 346 months in prison for second-degree murder to be served concurrently. This appeal follows.

**D E C I S I O N**

I.   **Sufficient evidence exists to prove beyond a reasonable doubt that appellant intended to cause the death of the victim.**

Appellant argues that there was insufficient evidence to prove that he intended to cause J.H.'s death. He further argues that he "shot in a panic or impulsively out of fear," but did not intend to kill the victim. We disagree.

"When the sufficiency of evidence is challenged, we review the evidence to determine whether, given the facts in the record and the legitimate inferences that can be

3

drawn from those facts, a jury could reasonably conclude that the defendant was guilty of the offense charged." *State v. Fairbanks*, 842 N.W.2d 297, 306-07 (Minn. 2014) (quotation omitted). We undertake "a painstaking analysis of the record to determine whether the evidence, when viewed in the light most favorable to the conviction, was sufficient to permit the jurors to reach the verdict which they did." *State v. Ortega*, 813 N.W.2d 86, 100 (Minn. 2012) (quotation omitted).

A defendant is guilty of second-degree murder when he or she, "causes the death of a human being with intent to effect the death of that person or another, but without premeditation." Minn. Stat. § 609.19, subd. 1(1). Criminal intent is defined as: "'[w]ith intent to' or 'with intent that' means that the actor either has a purpose to do the thing or cause the result specified or believes that the act, if successful, will cause that result." Minn. Stat. § 609.02, subd. 9(4) (2012). "A jury may infer a person's intent to kill from the nature of the killing." *State v. Young*, 710 N.W.2d 272, 278 (Minn. 2006) (citing *State v. Darris*, 648 N.W.2d 232, 236 (Minn. 2002)); *see State v. Harris*, 405 N.W.2d 224, 229 (Minn. 1987) (noting that intent can be inferred where the gun was fired at the victim at close range). Evidence that a person is armed with a gun and shoots a person at close range is sufficient to support a jury verdict of intentional murder. *State v. Fardan*, 773 N.W.2d 303, 321 (Minn. 2009) ("We concluded that evidence that the defendant was armed with a pistol when he accosted the victim and shot him at close range would 'alone' be sufficient for the jury's finding of intentional murder.") (citation omitted). Finally, intent may also be inferred by leaving an injured victim to die. *State v. Dimmick*, 586 N.W.2d 127, 129, 130 n. 7 (Minn. 1998) (citation omitted).

4

Viewing the evidence in the light most favorable to the conviction, it was sufficient for the jurors to reach the verdict that appellant acted with intent to kill J.H. based on the direct evidence of appellant's own testimony. Appellant knew he had a gun prior to entering the Hillside house. Appellant, who is left handed, pulled the gun out of his left-hand pocket. He admitted to pointing the gun at J.H. while standing directly in front of him, pulling the trigger two times and shooting J.H. twice in the chest. J.H. fell back on to the couch. And after the shooting, appellant pointed the gun towards the other people in the room and told everyone not to move. He then ran out through the front door to the car and went into hiding for nearly two weeks.

In addition to appellant's direct testimony as described above, A.B. observed appellant and Demetrias drive up to and enter the house and he observed appellant "grabbing [underneath] at his waist," when J.H. reached towards appellant's waist in a non-aggressive and non-threatening manner. A.B. stated that J.H. did not hit appellant and J.H. did not have any weapons nor did anyone else in the house. He observed that appellant's face was looking at J.H. and he shot him twice from about one to two feet away. Before leaving through the front door, A.B. saw that appellant pointed the gun toward the people in the room and he told everybody not to move. C.W. further observed appellant point towards Demetrias, who was in the kitchen arguing with Q.F., as if to state that he was at the Hillside house with Demetrias. C.W. also observed that J.H. did not act threatening towards appellant, he heard the first shot and saw the second shot fired by appellant, and saw J.H. fall back on the couch. C.W. stated that appellant told everyone in the room not to move.

These circumstances are consistent with guilt because they show appellant had the intent to cause J.H.'s death. *See* Minn. Stat. § 609.19, subd. 1(1). Appellant went with Demetrias to the Hillside House, he took the gun from Demetrias, he went into the house, approached an unarmed J.H., shot him two times in the chest at close range, and did not help him. He then threatened the other unarmed people in the room before running out the front door and driving away. Appellant then went into hiding for nearly two weeks.

Moreover, appellant's "presence, companionship, and conduct before and after an offense is committed are relevant circumstances from which the jury may infer criminal intent." *Bernhardt v. State*, 684 N.W.2d 465, 477 (Minn. 2004) (quotation omitted). Demetrias is appellant's stepfather. It is undisputed that Demetrias, Q.F., and J.H. were in a physical altercation that evening stemming from J.H.'s conduct at the bar. Appellant got in Demetrias's car at 2 a.m. in the morning, which he stated had never happened before, he took the gun from Demetrias, and put it in his left-hand pocket, and he went into the house with Demetrias. After he shot J.H., he ran out the front door, drove away with Demetrias, and gave Demetrias the gun. Appellant then went into hiding for nearly two weeks. Based on these relevant circumstances, the jury could infer his criminal intent. *See id.* at 477.

Appellant further argues that there was no motive or planning involved because he was unaware of the prior altercation between Demetrias and the other men. Moreover, appellant asserts that he was "ordered[1]" to accompany Demetrias, handed a gun, and went in the house, but he was unaware who was there or what might happen. But appellant's

---

[1] The record does not support the allegation that he was ordered.

6

argument regarding motive and planning is misguided because they are not elements to be proved for second-degree murder. *See* Minn. Stat. § 609.19, subd. 1(1).

Therefore, sufficient evidence exists to prove beyond a reasonable doubt that appellant intended to cause the J.H.'s death.

**II.     The district court acted within its discretion by admitting 11 text messages between appellant and his girlfriend.**

Appellant argues that the district court abused its discretion in admitting text messages and that our review should be under the harmless-error standard. We disagree. Although appellant initially objected to the admission of the text messages, appellant ultimately agreed that the text messages were relevant, were not unfairly prejudicial, the jury would decide their probative value, and appellant would have the opportunity to discuss the substance of the text messages during his testimony. Because appellant agreed to the admission of the text messages, the harmless-error standard is inapplicable and the plain-error standard applies.

"The plain error standard requires that the defendant show: (1) error; (2) that was plain; and (3) that affected substantial rights." *State v. Strommen*, 648 N.W.2d 681, 686 (Minn. 2002) (citing *State v. Griller*, 583 N.W.2d 736, 740 (Minn. 1998) (citing *Johnson v. United States*, 520 U.S. 461, 466-67, 117 S. Ct. 1544, 1548-49 (1997))). "If those three prongs are met, we may correct the error only if it 'seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.'" *Id.* at 686 (quoting *State v. Crowsbreast*, 629 N.W.2d 433, 437 (Minn. 2001)).

Appellant specifically argues that the text messages were not relevant because they were not directly or sufficiently probative of consciousness of guilt or were overly prejudicial. We are not persuaded. With some exceptions, "[a]ll relevant evidence is admissible," and "[e]vidence which is not relevant is not admissible." Minn. R. Evid. 402. One exception to the admission of relevant evidence is "if its probative value is substantially outweighed by the danger of unfair prejudice." Minn. R. Evid. 403. "Unfair prejudice under rule 403 is not merely damaging evidence, even severely damaging evidence; rather, unfair prejudice is evidence that persuades by illegitimate means, giving one party an unfair advantage." *State v. Schulz*, 691 N.W.2d 474, 478 (Minn. 2005).

The district court determined that the 11 text messages were relevant evidence of appellant's consciousness of guilt and that their probative value outweighed their prejudice. The district court also allowed appellant the opportunity to testify on the substance of the text messages and thereby minimize any potential prejudice. The 11 text messages show appellant's request for money while he was hiding from authorities, stating that he "did the sh-t," acknowledging that he would not turn himself in to the authorities, and making sure that nobody was following his girlfriend when he met with her. Evidence of pre-arrest flight is relevant as it "suggests consciousness of guilt." *State v. McDaniel*, 777 N.W.2d 739, 747 (Minn. 2010) (quotation omitted). As such, the text messages were highly probative of his consciousness of guilt, and the district court did not commit error in admitting them. Because we find no error, we need not consider the second and third prongs of the plain-error test.

III. **Prosecutorial misconduct**

Unobjected-to prosecutorial misconduct is reviewed under a modified plain-error test. *State v. Carridine*, 812 N.W.2d 130, 146 (Minn. 2012). Appellant acknowledges that he did not object to all the alleged prosecutorial misconduct.[2]

Under the modified plain-error test, "there must be (1) [an] error; (2) that is plain; and (3) the error must affect substantial rights." *State v. Ramey*, 721 N.W.2d 294, 298 (Minn. 2006) (citing *Griller*, 583 N.W.2d at 740. If the three prongs are met, we may correct the error if necessary to "ensure fairness and the integrity of the judicial proceedings." *Id.* An error is plain if it "contravenes case law, a rule, or a standard of conduct." *Id.* at 302. In cases of prosecutorial misconduct, the appellant has the burden of proving the error and that it was plain. *Id.* If appellant meets his burden, it shifts to the state to show that the error did not affect appellant's substantial rights, or in other words, that "there is no reasonable likelihood that the absence of the misconduct in question would have had a significant effect on the verdict of the jury." *Id.* (quotations omitted).

We first examine each claim individually to determine whether it constitutes misconduct. *State v. Dobbins*, 725 N.W.2d 492, 506 (Minn. 2006). If we determine there was prosecutorial misconduct, we must examine the misconduct individually and cumulatively to determine whether the misconduct denied appellant a fair trial. *Id.*

A.    **Misrepresented evidence**

1.    **Direct examination of Officer Keegel**

---

[2] Appellant argues that because the prosecutor implied non-existent evidence over defense counsel's objections, we should review the objected-to misconduct for harmless error. But, the record reflects that appellant failed to object. As such, we review the testimony for plain error.

Appellant alleges that the prosecutor intended to "misconstrue evidence," tried to "improperly imply to the jury" that he was hiding, that his family was "hiding him out," and prosecutors lacked evidence to prove this allegation. Appellant argues that this was plain error "affecting his substantial rights," thus denying him a fair trial. We disagree.

As an initial matter, appellant testified that he was hiding. When asked if he went into hiding, appellant stated, "yes." The prosecutor's reference to appellant's testimony on hiding was not error.

Additionally, the prosecutor asked the officer questions regarding home visits made to appellant's family and friends in an effort to locate him. The officer stated that on four dates, she visited approximately 20 residences in an effort to locate him or information regarding his whereabouts. The prosecutor also asked whether Mr. Gomez's family was "aware he was being sought after?" The district court allowed the testimony. *See McDaniel*, 777 N.W.2d at 747. The district court was within its discretion in allowing testimony related to appellant's admitted hiding from authorities to show consciousness of guilt. Because appellant fails to meet his burden of showing error, we need not consider the other prongs of the plain-error test.

### 2. Prosecutor's testimony regarding facts not in evidence

Appellant further alleges that the prosecutor's personal opinion in closing-rebuttal arguments about her co-prosecutor's examination was plain error because it referenced facts not in evidence. However, appellant fails to provide case law supporting that this was error. Mere assertions of error not supported by argument or authority cannot be

10

considered on appeal except where prejudice is obvious. *State v. Modern Recycling, Inc.*, 558 N.W.2d 770, 772 (Minn. App. 1997).

**B.      Closing argument**

"[T]he prosecutor and the defense have considerable latitude in closing argument, for neither is required to make a colorless argument." *State v. Smith,* 541 N.W.2d 584, 589 (Minn. 1996).   Nonetheless, appellant argues that the prosecutor committed misconduct in her closing argument.  First, he argues that she inflamed the passions of the jury by using "arguable consciousness of guilt evidence."  Second, appellant argues that the prosecutor committed misconduct by "improperly express[ing] her personal opinion that appellant was guilty" based on the text messages.  Third, he argues that the prosecutor intentionally misled the jury by misstating witness testimony.  Last, appellant argues that the prosecutor improperly injected racial issues into the case to inflame the jury's passions.

**1.      Consciousness of guilt evidence**

The prosecutor argued that appellant was in hiding for two weeks, which was evidence of consciousness of guilt.  As discussed above, appellant admitted to hiding, which is relevant evidence showing consciousness of guilt.  *See McDaniel*, 777 N.W.2d at 747.  Therefore, the prosecutor did not commit misconduct.

**2.      Personal opinion**

It is generally improper for a prosecutor to express his personal opinion as to the credibility of a witness.  *See State v. Ture*, 353 N.W.2d 502, 516 (Minn. 1984).  But, the prosecutor's reference to evidence produced at trial, or the reasonable inferences from that evidence, does not constitute prosecutorial misconduct.  *State v. Porter*, 526 N.W.2d 359,

11

363 (Minn. 1995). And conclusions and inferences may be stated so long as the prosecutor's opinion is not offered as substantive evidence. *See id*; *see also State v. Gulbrandsen*, 238 Minn. 508, 511-12, 57 N.W.2d, 419, 422 (1953). The prosecutor argued that the text messages showed appellant's consciousness of guilt. As discussed above, the text messages were relevant to show consciousness of guilt. The prosecutor's comments were not misconduct.

### 3. Misstating witness testimony

Next, appellant argues that the prosecutor committed misconduct in her closing argument by intentionally misleading the jury and misstating witness testimony. In her closing argument, the prosecutor stated that the victim "wasn't even touching [appellant]."

"Prosecutors and defense counsel alike have an ethical responsibility to avoid making improper closing arguments." *State v. Salitros*, 499 N.W.2d 815, 817 (Minn. 1993) (quotation omitted). Further, it is "unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury." *Id.*

Here, the record is undisputed that the victim touched appellant's waist but that he did not hit appellant nor was he aggressive towards appellant. The statement is contrary to the testimony and is therefore error. "An error is plain if it was clear or obvious," and "[u]sually this is shown if the error contravenes case law, a rule, or a standard of conduct." *Ramey*, 721 N.W.2d at 302 (citations omitted) (internal quotation marks omitted).

The state must now show that the error did not affect appellant's substantial rights. *Ramey*, 721 N.W.2d at 302. "[E]rror affects substantial rights if there is a reasonable

likelihood that the error had a significant effect on the jury's verdict." *State v. Gunderson*, 812 N.W.2d 156, 162 (Minn. 2012) (quotation omitted).

In determining whether the prosecutor's misstatement affected appellant's substantial rights, we apply the factors set forth in *State v. Prtine*, 784 N.W.2d 303, 315-314 (Minn. 2010). "To determine if the error was prejudicial, we evaluate the strength of the evidence against the defendant, the pervasiveness of the improper suggestions, and whether the defendant had an opportunity to (or made efforts to) rebut the improper suggestions." *Id*. (citations omitted). First, the distinction between the actual testimony and the prosecutor's misstatement is not subtle, which may have influenced the jury. Second, the offending statement was brief, only mentioned once, and the prosecutor did not linger on the statement, which was only one sentence in her 20-page closing argument. Third, appellant's attorney acknowledged and corrected the prosecutor's misstatement. Fourth, the district court instructed the jury to disregard any improper comments made by the attorneys because they were not evidence. *State v. Yang*, 627 N.W.2d 666, 681 (Minn. App. 2001) (illustrating the district court's use of curative instructions to a jury, thus rendering improper remarks as harmless.), *review denied* (Minn. July 24, 2001).

After reviewing the prosecutor's closing arguments and taking into account the entire record of over 1,000 pages, we conclude that, even if the one statement viewed independently constituted misconduct, it did not have a significant effect on the jury's verdict and therefore did not affect appellant's substantial rights. *See Montanaro v. State*, 802 N.W.2d 726, 734 (Minn. 2011) (concluding that prosecutor's statements during closing statement did not individually or collectively affect appellant's substantial rights.).

13

### 4.    Injecting racial issues

Finally, appellant alleges that the prosecutor's comments during the closing arguments "injected racial issues" into the case to inflame the jury's passions.  Here, the prosecutor reminded the jury about her statement in voir dire where she discussed that they would hear "testimony from individuals who may have a different lifestyle than you . . . they may drink more than you do, they may use marijuana . . . And that's one component of who they are. . . . But does that mean that somehow they're not telling the truth?"  She further explained that although the witnesses "probably spoke a little bit differently than many of you do" their testimony was reasonable and corroborated.

In *State v. Robinson*, the supreme court concluded that a prosecutor's comments intended to prepare the jury for evidence "of an unfamiliar world" did not constitute misconduct.  604 N.W.2d 355, 363 (Minn. 2000) (concluding that the statement that "the appellant was not of the same world as the jurors and clearly was distinguishable from a businessman from Edina, Pope John Paul and Mother Teresa [did not] impermissibly appeal[] to the prejudice and passion of the jury").  *But see State v. Ray*, 659 N.W.2d 736, 746-47 (Minn. 2003) (concluding that a prosecutor's statements that "[t]his is a dispute . . . involving three young black males in the hood in North Minneapolis.  This is not your environment, this is the [d]efendant's environment," constituted prosecutorial misconduct because "[s]uch an invitation asks the jury to apply racial and socio-economic considerations that would deny a defendant a fair trial" and should be avoided.).  In this case, the statements did not rise to the level of *Robinson*, much less *Ray*.  Moreover, the

statements made were not racially biased.  Accordingly, we conclude there was no evidence of prejudice and that the prosecutors did not commit misconduct.

**Affirmed.**